REGINALD TERRELL, ESQ.
THE TERRELL LAW GROUP
223 25th Street
Richmond, California 94804
Telephone: (510) 237-9700
Facsimile: (510) 237-4616

DONALD AMAMGBO, ESQ.
AMAMGBO & ASSOCIATES
7901 Oakport Street, Suite 4900
Oakland, California 94621
Telephone: (510) 615-6000
Facsimile: (510) 615-6025

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

FOR NORTHERN DISTRICT OF CALIFORNIA

SANDRA WILLIAMS and FRED WILLIAMS, on behalf of themselves and all others similarly situated,

    Plaintiffs,

vs.

GENERAL MOTORS CORPORATION,

    Defendants.

**CLASS ACTION**

**JURY TRIAL DEMANDED**

ADR

PJH

C07-03806

<u>**Class Action Complaint**</u>
<u>**Notice To Preserve Records and Documents**</u>

You are hereby **notified** to preserve all records and documents in all forms and formats (digital, electronic, film, magnetic, optical, print, etc.) during the pendency of this action that are relevant or may lead to relevant information and to notify your employees, agents and contractors that they are required to take appropriate action to do so.

<u>**Introduction**</u>

CLASS ACTION COMPLAINT

1. Plaintiffs bring this class action against General Motors Corporation due to its failure to disclose that the analog telematic equipment in its vehicle will cease to operate on the OnStar system.

2. OnStar is a unique in-vehicle telecommunication safety system that provides automatic crash notification to emergency responders, stolen vehicle location, remote door unlock and remote diagnostics in the event of problems with airbags, anti-lock brakes or other systems. According to OnStar:

> [OnStar provides] critical communications links among members of the public, emergency medical service providers and emergency dispatch providers; public safety, fire service and law enforcement officials, and hospital emergency and trauma care facilities.

\* \* \*

3. Because of defendant's actions, plaintiffs and thousands of other OnStar owners, lessees and subscribers will lose the benefits of this safety system, will be exposed to an increased risk of serious personal injury and harm, and their motor vehicles will lose substantial value. Plaintiffs seek damages and appropriate injunctive relief for themselves and all others similarly situated.

## The Parties

4. Plaintiff Sandra Williams is a resident and citizen of Oakland, Alameda County, California.

5. Plaintiff Fred Williams is a resident and citizen of Oakland, Alameda County, California.

6. Defendant General Motors Corporation ("GM") is a Delaware corporation with its principal place of business and national headquarters located at 300 Renaissance Center, Detroit, California. GM designs, tests, manufactures, markets, advertises, warrants, distributes, sells or leases cars, trucks and sports utility trucks under several prominent brand names, including, but not limited to: General Motors, Chevrolet, Buick, Cadillac and Pontiac throughout the United States.

7. OnStar Corporation is a wholly-owned subsidiary of GM and was at all times expressly and impliedly controlled and directed by GM.

8. At all relevant times, GM acted by and through its agents, servants, workmen and employees who were then and there acting within the course and scope of their permission, agency, employment and authority, in furtherance of defendant's business and otherwise on behalf of defendant.

### Jurisdiction and Venue

9. Plaintiffs bring this action seeking class-action status and alleging violations of the California Consumer Fraud Act, the consumer fraud acts of the fifty states, breach of warranty, fraudulent omission and injunctive relief. This Court has jurisdiction over these claims pursuant to 28 U.S.C. 1332(d).

10. Venue is proper in this District because defendant GM and its subsidiary, OnStar Corporation, are both headquartered in this District and many of the acts and transactions giving rise to the violations of law alleged herein occurred within the emanated from GM's offices in this District. Specifically, the marketing and sales materials discussing OnStar, and containing the material misstatements and omissions alleged herein, were designed, developed and approved by GM personnel at facilities in this District. The overall marketing and sales efforts for OnStar were directed and controlled from the defendant's facilities in this District.

### Background

11. OnStar is a telematic safety communications system for motor vehicles which is integrated into the vehicle. By the press of a button, OnStar enables vehicle occupants to receive emergency service and information anywhere in the United States and portions of Canada. OnStar describes the system on its website as:

> OnStar's in-vehicle safety, security, and information services use Global Positioning System (GPS) satellite and cellular technology to link the vehicle and driver to the OnStar Center. At the OnStar Center, advisors offer real-time, personalized help 24 hours a day, 365 days a year.
> http://www.onstar.com/us_english/jsp/explore/onstar_basics/technology:jsp

12. OnStar service is a unique system which is not available from other sources.

13. GM has developed and operated the OnStar system throughout the United States and Canada since about 1998.

14. At all relevant times, GM maintained the policy and practice of selling OnStar equipped vehicles and providing service and parts for safety components through a network of authorized dealers.

15. By April 2001 OnStar had over one million subscribers. By January 2006 OnStar had approximately 4 million subscribers. Of course many other GM vehicles contained telematics equipment, but did not maintain a subscription.

16. From its inception and for a considerable period of time thereafter, the OnStar system used analog cellular telephone technology. Occupants of an OnStar equipped vehicle communicate with the OnStar Center by analog cellular service, with confidential access numbers, arranged by defendants with third-party cellular service providers. Vehicles with analog-only telematics equipment only function on analog cellular systems.

17. GM manufactured and/or supplied the analog-only telematics equipment used in the OnStar system.

18. For a considerable period of time prior to 2002 and continuing thereafter, GM knew or should have known that cellular providers were converting to digital systems and that GM's analog-only equipment would not function on digital only cellular systems.

19. OnStar service for new vehicles is typically free for the first 12 months and thereafter provided on a subscription basis.

### The FCC Rule Change

20. In May 2001 the FCC proposed to eliminate the rule that all wireless phone carriers must operate an analog network for wireless calls. *Notice of Proposed Rule Making*, 16 FCC Red11169 (2001).

21. GM, OnStar Corporation and various other telematics providers and vendors were well aware of the FCC's proposal to no longer require the maintenance of analog networks. GM and many other telematics providers filed comments and objections to the FCC's proposal.

OnStar filed comments with the FCC on July 2, 2001 and August 1, 2001. The August Reply Comments specifically state that they are made on behalf of OnStar and GM.

22. OnStar's comments to the FCC acknowledged that the average car had a lifespan of 8-9 years, and that almost 40 percent of vehicles on the road were over 10 years old. OnStar also acknowledged that the "life saving benefits of OnStar are intended not only for initial vehicle purchasers but for subsequent owners over the life of the vehicle." OnStar stated that its analog equipment would not work without an analog wireless phone network.

23. While GM, through OnStar, told these important facts to the FCC, it never told its customers and instead continued to sell its cars with analog telematics equipment and the promise that its OnStar product would continue to provide "emergency services".

24. A July 31, 2002 News Release from GM touted the benefits of a new version of OnStar. "The next-generation GM automatic crash notification system linked with OnStar will assist even more customers by taking this potentially life-saving service beyond air bag deployments." GM's news release did not mention the fact that it new system was analog and would not operate after 2007. That critical fact was not revealed to GM's customers.

25. On September 24, 2002 the FCC issued a Report and Order announcing that it would modify § 22.901 and § 22.933 of its Rules to eliminate the requirement that wireless carriers provide analog service for mobile phone networks. The FCC provided for a 5 year transition period, which will end on February 18, 2008.

26. Thus, by September 24, 2002 GM knew that the analog telematics equipment it had installed and was still installing in its vehicles would stop working by February 19, 2008.

27. However, GM intentionally failed to advise customers of this date certain that its equipment would no longer work, and continued to equip its vehicles with, and provide customers, analog equipment, all the while touting OnStar as an important safety feature, even though GM knew it would be useless after a certain date.

28. GM's North American President, Troy Clark, has affirmatively stated that GM would not "walk away from" its analog OnStar customers or leave them "in the lurch". These

statements constitute an extension of GM's various warranties for its analog Telematics equipment.

### Facts as To the Representative Plaintiffs

29. In October 2003, Sandra Williams purchased a new GMC Envoy equipped with an analog-only OnStar system from Oncil GMC, an authorized GM dealer in Oakland, California.

30. In March 2005, Fred Williams purchased a Cadillac CTS sedan from Oakland Cadillac, an authorized GM dealer in Oakland, California. Mr. Williams' Cadillac was equipped with factory installed analog-only Telematics equipment.

31. At the time of purchase, GM provided both plaintiffs with a "Bumper to Bumper" warranty covering "the complete vehicle" for three years or 36,000 miles, whichever occurs first.

32. Plaintiff S. Williams subsequently purchased an extended GM warranty for the vehicle. The warranties were expressly extended to subsequent owners and lessees.

33. In the new vehicle and extended warranties, GM expressly represented and warranted to the purchasers and subsequent owners and lessees that during the warranty period GM would provide repairs, upgrades and if necessary, replacement, to "correct any vehicle defect related to materials or workmanship" at no cost to the Williams or the subsequent owner or lessee.

34. Plaintiffs purchased their vehicles for personal, family and household use.

35. At the time of purchase, GM expressly and impliedly represented to plaintiffs that its telematics equipment would provide safety and security and would function and be available for the life of the vehicle.

36. These representations were made in the OnStar Owner's Guide (the "Guide").

37. In the Guide, it was represented that:

(a) OnStar is a safety device that "uses sophiscated . . . technology to provide the communication link and seamless integration into their vehicle" so that OnStar "Advisors" can provide plaintiffs with "a range of helpful services to protect [plaintiffs] and [their] vehicle". (Guide, p.4);

    (b)    OnStar will put "Safety, Security and Convenience at [plaintiff's] Fingertips". (Guide, Cover);

    (c)    "The ease of the hands-free communications service allows [plaintiff] to enjoy an even greater level of safety, security and convenience while driving". (Guide, p.5);

    (d)    OnStar's service center and Advisors are available "24 hours a day, seven days a week... Even on weekends and holidays, there is always someone ready to help." (Guide, p.4);

    (e)    [Plaintiff] can renew his Safe & Sound plan "for excellent protection, 24/7, 365 days a year". (Guide, p. 16); and

    (f)    "If [plaintiff] purchased additional years [of service] or upgraded [their] OnStar service, when [plaintiff] dispose of the vehicle, [plaintiff] . . . may transfer the remaining service to the new owner". (Guide, p. 50).

38. At the time of purchase, GM expressly and impliedly represented and warranted to plaintiffs that the telematics equipment in their vehicles was free of defects and would be suitable for use in the OnStar system.

39. GM's implied warranties included its custom and practice of providing repair parts and service for defective safety components for the reasonable life of a vehicle. This custom and practice was part of plaintiffs' bargain to purchase their vehicles.

40. At the time of purchase, GM and OnStar did not disclose to plaintiffs that their telematics equipment was analog and would either stop working or need a costly upgrade to function on digital only cellular systems.

41. GM knew or should have known that its telematics equipment was certain to become useless, was not fit for its ordinary and intended use, and did not perform in accordance with the advertisements, marketing materials and warranties disseminated by GM, nor with the reasonable expectations of ordinary consumers.

42. Plaintiffs have paid all of their OnStar subscriptions fees. Their accounts are current and active.

43. By letter, GM, through its OnStar subsidiary, advised plaintiffs that their hardware was analog, but could be upgraded to digital for an additional cost. Without the

upgrade, their telematics equipment would not work after December 31, 2007. GM further advised that it would not repair, modify or replace the telematics equipment.

44. The Williams' vehicles have less 75,000 aggregate miles and are less than four years old.

45. Hundreds of thousands of GM customers have received similar letters from GM and OnStar, advising them of the imminent failure of their telematic equipment.

46. Previously, OnStar and GM concealed from plaintiffs that the telematics equipment GM installed in their vehicles would either stop working entirely or would require a costly upgrade to remain compatible with the OnStar system, and that without the upgrade the OnStar service would be terminated involuntarily.

47. The analog telematics equipment in plaintiffs' vehicle is defective and was defective at the time of purchase.

48. The analog telematics equipment in plaintiffs' vehicles is not suited for its intended purpose.

49. GM refuses to provide plaintiffs with OnStar safety and security services as promised.

50. OnStar has stated on its website that it does not believe the imminent failure on the analog-only telematics equipment is covered under any applicable warranty.

51. Solely because of defendant's conduct.

    (a) plaintiffs will incur costs and expenses to replace and/or repair the analog telematics equipment in their vehicles to function with digital cellular service;

    (b) plaintiffs will suffer significant depreciation and the loss of value of their vehicles due to the nonfunctional analog OnStar system; and

    (c) Plaintiffs will be exposed to an increased risk of serious personal injury and harm.

### Estoppel From Pleading and Tolling of Applicable Statutes of Limitation

52. Any applicable statute of limitations that might otherwise bar Plaintiffs' and class members' claims should be tolled because Plaintiffs and the class members exercised all due

1  diligence that would reasonably be expected of consumers in the context of purchasing or
2  leasing a car. That is, they attentively reviewed the standard and safety features of the cars at
3  issue, including but not limited to the written materials provided by GM, but had no realistic
4  ability to discern that the telematic equipment would become useless.

5      53.    Notwithstanding the exercise of due diligence, Plaintiffs and the class members
6  could not reasonably have been expected to learn or discover the fact that they were deceived
7  and that material information concerning the telematics equipment was concealed from them.
8  Therefore, the claims being asserted by Plaintiffs and the class members present the archetypical
9  scenario in which the discovery rule is applicable.

10      54.    GM is also estopped from relying on any statutes of limitation by virtue of its acts
11  of fraudulent concealment. Upon information and belief, both GM and OnStar have known of
12  the change to digital networks since at least 2002, if not earlier, and have concealed from owners
13  and lessees of the cars the impending failure of the telematics equipment.

## Class Action Allegations

15      55.    Plaintiffs bring this action individually and on behalf of the following class:

> All individuals and entities in the United States who own or lease General Motors vehicles equipped with analog telematics equipment and who acquired the vehicle during the period from September 25, 2002 through the present.

21      56.    Excluded from the Class are: defendant General Motors, its parent, subsidiaries,
22  affiliates and dealers, their respective parents, subsidiaries, affiliates; and any governmental.

23      57.    Plaintiffs reserve the right to modify the class definitions after discovery and at
24  any time up to and including trial.

25      58.    Plaintiffs believe that GM has acted in the same or similar manner with respect to
26  all class members.

27      59.    All class members purchased the same or similar incompatible, defective and
28  unsuitable analog telematics equipment, received the same representations, has the same express

and implied agreements for telematics equipment and warranties, received the same notices of termination, and has or will sustain the same or similar damages.

60. <u>Numerosity.</u> The class is so numerous that joinder of all members is impracticable.

(a) Plaintiffs believe that GM has sold telematics equipment to subscribers who own or leas the following model vehicles in the United States which have analog telematics equipment: Chevrolet, Pontiac, Oldsmobile, Buick, Cadillac, GMC and Saturn.

(b) There are over 400,000 OnStar subscribers with analog-only equipment who have received notice of termination, who will have standard investments in their motor vehicles, and who may be stranded on the highways and exposed to an increased risk of serious personal injury and harm if GM does not repair and/or replace the analog telematics equipment or arrange for continued OnStar service.

(c) There are hundreds of thousands of OnStar owners whose equipment will require costly upgrades to continue functioning after December 31, 2007.

61. <u>Commonality.</u> There are numerous questions of law and fact that are common to all class members and that predominate over individual questions, if any.

(a) Common questions of fact include but not limited to:

(i) All class members purchased or leased a vehicle with analog telematics equipment.

(ii) telematics equipment is a consumer product for all class members.

(iii) All class members' telematics equipment was defective and not suited for use with the OnStar system.

(iv) GM made the same express and implied representations and warranties to all class members.

(v) GM maintains the same customs, policies and practices regarding service and repairs for safety components.

(vi) GM concealed and failed to disclose the same information regarding the defects in its analog telematics equipment.

CLASS ACTION COMPLAINT

    (vii) All class members were given the same or similar notices of termination of analog service.

    (viii) GM refuses to provide class members with repairs, replacements, devices or other means to receive OnStar digital service.

    (ix) All class members have suffered the same or similar damage because of defendants' conduct.

  (b) Common questions of law include but not limited to:

    (i) Did GM fail to disclose and/or omit material facts relating to its telematics equipment?

    (ii) Did GM breach its express warranties?

    (iii) Did GM breach its implied warranty of merchantability?

    (iv) Did GM breach its implied warranty of fitness for particular purpose?

    (v) Is GM legally responsible for the class damages?

    (vi) Is the class entitled to injunctive or declaratory relief?

62. <u>Typicality.</u> Plaintiffs' claims are typical of the claims of the class and members. Plaintiffs are members of the class. Plaintiffs are asserting the same rights, making the same claims, and seeking the same relief for themselves and for all other class members.

63. <u>Adequate and Fair Representation.</u> Plaintiffs will fairly and adequately represent and protect the interests of the class. Plaintiffs have not interests that conflict with or which are adverse to the interests of other class members. Plaintiffs have retained qualified counsels who are able and experienced in class action litigation.

64. <u>Fairness and Efficiency.</u> A class action is a fair and efficient method to adjudicate this controversy.

  (a) Common questions of law and fact predominate over individual questions.

  (b) The claims of plaintiffs and the class are based on the same common nucleus of operative facts. Proof of plaintiffs' claims will effectively prove the claims of all other class members.

  (c) Resolution of the claims of the class will depend on the application of common principles of law.

  (d) A class action will permit a large number of relatively small claims involving similar facts and legal issues to be resolved efficiently in one proceeding based on common proof.

  (e) This case is manageable as a class action in that:

    (1) The material evidence is relatively simple and centralized.

    (2) GM and OnStar maintain computer and business records which will enable plaintiffs to identify class members and establish liability and damages.

    (3) Damages for class members can be calculated in the same or similar manner.

  (f) The claims of individual class members are not sufficiently large enough to support litigation on an individual, case-by-case basis.

  (g) A class action will result in an orderly and expeditious administration of claims and will foster economies of time, effort and expense.

  (h) A class action will contribute to uniformity of decisions concerning defendant's conduct.

  (i) This class action is best available method, and indeed the only realistic method, by which plaintiffs and the class can seek redress for the harm caused by GM.

## FIRST CAUSE OF ACTION
## VIOLATION OF THE CALIFORNIA CONSUMER PROTECTION ACT

65. Plaintiffs incorporate by reference all preceding paragraphs. The acts and practices of defendant as alleged herein constitute unlawful, unfair, and fraudulent business acts and practices within the meaning of California Business & Professions Code § 17200, *et seq.*

20. Defendants have engaged in "unlawful" business acts and practices by violating Bus. & Prof. Code § 17500, *et seq.*

21. Plaintiff reserves the right to allege other violations of law which constitute unlawful acts or practices. Such conduct is ongoing and continues to this date.

22. Defendants have also engaged in a "fraudulent" business act or practice in the representations and omissions described herein are false and/or likely to deceive potential and current customers.

23. Defendants have also engaged in "unfair" business acts or practices in the harm caused by defendants' conduct outweighs any utility of such conduct and such conduct, offends public policy, is immoral, unscrupulous, unethical, deceitful and offensive, and causes substantial injury to consumers.

24. The aforementioned unlawful, fraudulent, and unfair business acts or practices conducted by defendants continue to this day. Defendants have failed to publicly acknowledge the wrongful nature of their actions and have not corrected the advertisements.

25. As a direct and proximate result of these acts, consumers have been and are being harmed. Plaintiff brings this action pursuant to Sections 17203 and 17204 for injunctive relief to enjoin the practices described herein.

## SECOND CAUSE OF ACTION

Untrue and Misleading Advertising
Bus. & Prof. Code §§ 17500, *et seq.*
(Against all Defendants)

26. Plaintiff hereby incorporates by reference each of the preceding allegations as though fully set forth herein.

27. California's False Advertising law (Bus. & Prof. Code §§ 17500, *et seq.*) makes it unlawful for any person to make or disseminate or cause to be made or disseminated before the public in this state, . . . in any advertising device . . . or in any other manner or means whatever, including over the Internet, any statements, concerning . . . personal property or services, professional or otherwise, or performance or disposition thereof, which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading.

28. Defendant disseminated to member of the public in this state, statements relating to the free month advertising campaign.

29. The statements were untrue and misleading.

30. Defendants knew or should have known, through the exercise of reasonable care the statements were untrue and misleading.

31. Defendants' actions in violation of Section 17500 were false and misleading such that the general public it was likely to be deceived.

32. As a direct and proximate result of these acts, consumers have been and are being harmed. Plaintiff brings this action pursuant to Sections 17535 for injunctive relief to enjoin the practices described herein.

### THIRD CAUSE OF ACTION

UNJUST ENRICHMENT/RESTITION
(Against all Defendants)

33. Plaintiff hereby incorporates by reference each of the preceding allegations as though fully set forth herein.

34. Defendants were unjustly enriched at Plaintiff's and the putative class' expense Defendant should restore the ill-gotten gains to Plaintiff and the class.

66. Plaintiffs and members of the Class are consumers and Defendant GM is a seller and therefore subject to the CALIFORNIA Consumer Protection Act.

67. GM's statements, representations, omissions, and practices made in connection with their sale of the telematics equipment as alleged herein were in violation of the following sections of the California Unfair Competition Consumer Protection Act, MCL § 445.903:

68. Defendant's violation of the California's Consumer Protection Act proximately caused damages to plaintiffs and members of the class.

WHEREFORE, plaintiffs, individually and on behalf of the Class members, request judgment in their favor and against defendant, and request the following relief:

CLASS ACTION COMPLAINT

(a) certification of the plaintiff Class, the appointment of plaintiffs as class representatives, and the appointment of plaintiffs' counsel as class counsel;

(b) compensatory damages for the Class to be determined at trial, together with interest, costs attorneys' fees;

(c) exemplary damages;

(d) injunctive relief enjoining the defendant from engaging in the unlawful conduct described herein; and

(e) such other relief as may be just, necessary or appropriate.

## FOURTH CAUSE OF ACTION

## UNFAIR AND DECEPTIVE TRADE PRACTICES IN VIOLATION OF ALL STATES' CONSUMER PROTECTION ACTS

69. Each of the preceding paragraphs is incorporated by reference as though fully set forth herein.

70. Alternatively, GM's actions, as complained of herein, constitute unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of various state consumer protection statutes listed below:

(a) GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of Ala. Code § 8-19-1, *et seq.*;

(b) GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of Alaska Stat. Code § 45.50.471, *et seq.*;

(c) GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of Ariz. Rev. Stat. § 44-1522, *et seq.*;

(d) GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of Ark. Code § 4-88-101, *et seq.*;

(e) GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of Michigan Consumer Protection Act, MCL Section 445.903, *et seq.*;

(f) GM has engaged in unfair competition or unfair or deceptive acts or practices or have made false representations in violation of Colo. Rev. Stat. § 6-1-105, *et seq.*;

     (g)     GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of Conn. Gen. Stat. § 42-110b, *et seq.;*

     (h)     GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of 6 Del. Code § 2511, *et seq.;*

     (i)     GM has engaged in unfair competition or unfair or deceptive acts or practices or made false representations in violation of D.C. Code § 28-3901, *et seq.;*

     (j)     GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of Fla. Stat. § 501.201, *et seq.;*

     (k)     GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of Ga. Stat. § 10-1-392, *et seq.;*

     (l)     GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of Haw. Rev. Stat. § 480, *et seq.;*

     (m)     GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of Idaho Code § 48-601, *et seq.;*

     (n)     GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS § 505/I, *et seq.;*

     (o)     GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of Ind. Code. Ann. § 24-5-0.5.1, *et seq.;*

     (p)     GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of Iowa Code § 714.1b, *et seq.;*

     (q)     GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of Kan. Stat. § 50-623, *et seq.;*

     (r)     GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of Ky. Rev. Stat. § 367.110, *et seq.;*

     (s)     GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of La. Rev. Stat. § 51:1401, *et seq.;*

1    (t) GM has engaged in unfair competition or unfair or deceptive acts or
2 practices in violation of 5 Me. Rev. Stat. § 207, *et seq.;*

3    (u) GM has engaged in unfair competition or unfair or deceptive acts or
4 practices in violation of Alaska Stat. Code § 45.50.471, *et seq.;*

5    (v) GM has engaged in unfair competition or unfair or deceptive acts or
6 practices in violation of Mass. Gen. L. Ch. 93A, *et seq.;*

7    (w) GM has engaged in unfair competition or unfair or deceptive acts or
8 practices in violation of Minn. Stat. § 325F.67, *et seq.;*

9    (x) GM has engaged in unfair competition or unfair or deceptive acts or
10 practices in violation of Miss. Code Ann. § 75-24-1, *et seq.;*

11    (y) GM has engaged in unfair competition or unfair or deceptive acts or
12 practices in violation of Vernon's Mo. Rev. Stat. § 407.010, *et seq.;*

13    (z) GM has engaged in unfair competition or unfair or deceptive acts or
14 practices in violation of Mont. Code § 30-14-101, *et seq.;*

15    (aa) GM has engaged in unfair competition or unfair or deceptive acts or
16 practices in violation of Neb. Rev. Stat. § 59-1601, *et seq.;*

17    (bb) GM has engaged in unfair competition or unfair or deceptive acts or
18 practices in violation of Nev. Rev. Stat. § 598.0903, *et seq.;*

19    (cc) GM has engaged in unfair competition or unfair or deceptive acts or
20 practices in violation of N.H. Rev. Stat. § 358-A-1, *et seq.;*

21    (dd) GM has engaged in unfair competition or unfair; unconscionable or
22 deceptive acts or practices in violation of N.J. Stat. Ann. § 56:8-1, *et seq.;*

23    (ee) GM has engaged in unfair competition or unfair or deceptive acts or
24 practices in violation of N.M. Stat. Ann. § 57-12-1, *et seq.;*

25    (ff) GM has engaged in unfair competition or unfair or deceptive acts or
26 practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.;*

27    (gg) GM has engaged in unfair competition or unfair or deceptive acts or
28 practices in violation of N.C. Gen. Stat. § 75-1.1, *et seq.;*

1     (hh) GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of N.D. Cont. Code § 51-15-01, *et seq.;*

    (ii) GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of Ohio Rev. Stat. § 1345.01, *et seq.;*

    (jj) GM has engaged in unfair competition or unfair or deceptive acts or practices or made false representations in violation of Okla. Stat. tit. 15 § 751, *et seq.;*

    (kk) GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of Or. Rev. Stat. § 646.605, *et seq.;*

    (ll) GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of 73 Pa. Stat. § 201-1, *et seq.;*

    (mm) GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of R.I. Gen. Laws. § 6-13.1-1, *et seq.;*

    (nn) GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Laws § 39-5-10, *et seq.;*

    (oo) GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Code Laws § 37-24-1, *et seq.;*

    (pp) GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of Tenn. Code § 47-18-101, *et seq.;*

    (qq) GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of Tex. Bus. & Com. Code § 17.41, *et seq.;*

    (rr) GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of Utah Code Ann. § 13-11-1, *et seq.;*

    (ss) GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of Vt. Stat. Ann. tit 9, § 241 1, *et seq.;*

    (u) GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of Va. Code § 59.1-196, *et seq.;*

    (uu) GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of Wash. Rev. Code § 19.86.010, *et seq.;*

    (vv) GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of W. Va. Code § 46A-6-101, *et seq.*;

    (ww) GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of Wis. Stat. § 100.20, *et seq.*;

    (xx) GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of Wyo. Stat. § 40-12-100, *et seq.*;

71. Defendant's violations of the state consumer protection statutes listed above proximately caused damage to plaintiffs and members of the class.

WHEREFORE, plaintiffs, individually and on behalf of all Class members, request judgment in their favor and against defendant, and request the following relief:

    (a) certification of the plaintiff Class, the appointment of plaintiffs as class representatives, and the appointment of plaintiffs' counsel as class counsel;

    (b) compensatory damages for the Class to be determined at trial, together with interest, costs attorneys' fees;

    (c) exemplary damages;

    (d) injunctive relief enjoining the defendant from engaging in the unlawful conduct described herein; and

    (e) such other relief as may be just, necessary or appropriate.

## FIFTH CAUSE OF ACTION

## FRAUDULENT OMISSION

72. Plaintiffs incorporate by reference all preceding paragraphs.

73. Defendant engaged in a scheme, common course of conduct, and conspiracy to defraud Plaintiff and members of the class. As part of this scheme. Defendant failed to state facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

74. Defendant's omissions were material in that there was a substantial likelihood that a reasonable prospective purchaser would have considered them important in deciding whether or not to purchase a vehicle equipped with OnStar.

75. Defendant failed to disclose *inter alia:*

   (a) that its telematics equipment worked only on an analog wireless signal, or that its telematics equipment would require modification to work with a digital wireless signal;

   (b) that analog wireless networks would not be available after a date certain in the future; and

   (c) that the customer would no longer have touted safety and security benefits of OnStar after a date certain.

76. At the time GM made these omissions of fact, and others alleged herein, they knew that the failure to disclose known facts would be misleading.

77. GM knew that such information was material to the transaction, the non-disclosure of which would tend to mislead. Moreover, GM had a duty to plaintiffs and members of the Class to disclose such facts, and to ensure that all of its statements and representations were complete, truthful and not false and misleading.

78. Plaintiffs and members of the Class were ignorant of GM's omissions, and could not have discovered them through reasonable diligence.

79. In ignorance of the true facts, plaintiffs and other members of the Class were induced to, and did, purchase vehicles with the subject analog telematics equipment. Had plaintiffs and the other members of the Class known of the true facts, they would not have taken such action.

80. Defendant's conduct was willful, wanton, malicious, outrageous, and in reckless disregard for the rights of Plaintiffs and members of the Class, and plaintiffs and the Class are entitled to exemplary damages.

81. As a direct and proximate result of Defendant's fraudulent omissions, plaintiffs and members of the Class have been damaged.

WHEREFORE, plaintiffs, individually and on behalf of all Class members, request judgment in their favor and against defendant, and request the following relief:

   (a) certification of the plaintiff Class, the appointment of plaintiffs as class representatives, and the appointment of plaintiffs' counsel as class counsel;

CLASS ACTION COMPLAINT